# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION


BRENDON G. LABOR                                                    PLAINTIFF


v.                              NO. 1:16-cv-00039 PSH


CAROLYN W. COLVIN, Acting Commissioner                             DEFENDANT
of the Social Security Administration


## MEMORANDUM OPINION AND ORDER


Plaintiff Brendon G. Labor ("Labor") began the case at bar by filing a complaint

pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the

Acting Commissioner of the Social Security Administration ("Commissioner"), a decision

based upon findings made by an Administrative Law Judge ("ALJ").

Labor maintains that the ALJ's findings are not supported by substantial evidence

on the record as a whole and offers two reasons why.[1] Labor first maintains that his

impairments include borderline intellectual functioning, and the ALJ erred at step two

of the sequential evaluation process when he failed to find that the impairment is severe.

At step two, the ALJ is required to identify the claimant's impairments and

---

[1]

The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

determine whether they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted]. Once a claimant's impairments are identified, and it is determined that they do not meet or equal a listed impairment, the ALJ is required to consider all of the claimant's impairments, both severe and non-severe, in assessing his residual functional capacity.

The evidence relevant to Labor's intellectual functioning is not voluminous. The evidence reflects that in September of 1988, or approximately twenty-five years before the alleged onset date, Labor was seen by a school psychologist for an evaluation and a determination of whether Labor should continue in special education classes. See Transcript at 309-311.[2] The psychologist administered Wechsler Adult Intelligence Scale ("WAIS") testing, and it indicated that Labor had a verbal IQ of seventy-six, a performance IQ of seventy-one, and a full scale IQ of seventy-three.

In March of 1993, Labor was seen for an assessment of his intellectual functioning. See Transcript at 367-372. A psychological examiner administered WAIS testing, and Labor's scores included a performance IQ of sixty-six. The psychological examiner's conclusions and recommendations were as follows:

Findings indicate generally below average intellectual and academic ability.

---

[2]

Labor seeks supplemental security income payments pursuant to Title XVI of the Social Security Act. Although he alleges on onset date of May 7, 1993, the relevant period for his claim began on the day he filed his application for such payments, i.e., March 22, 2013. The Court will nevertheless briefly consider evidence prior to March 22, 2013, for the purpose of placing his application in context.

> Mr. Labor appears to be within the [b]orderline range of intellectual functioning with significant deficits in his ability to make appropriate social judgments and respond in a socially adequate manner. This deficit will make it difficult for Mr. Labor to function adequately in a vocational setting for any sustained period of time. Semi-skilled training, such as that which might be available at a local vocational-technical training facility, is feasible. Extensive vocational and personal guidance and assistance are needed. Provided these services, Mr. Labor may reasonably be expected to sustain independent functioning by means of low-demand employment. Mr. Labor's test performance is commensurate with expectations deprived from the demonstrated level of formal education and reported academic history.

See Transcript at 372.

In July of 1995, Labor was seen by a psychologist for intelligence testing. See Transcript at 362-363. The psychologist administered WAIS testing, and Labor's scores included a performance IQ of sixty-nine. The psychologist diagnosed a chronic adjustment disorder, mild mental retardation, and a dependent personality disorder.

The record is silent as to any other testing of Labor's intellectual functioning until April of 2013 when he was seen by Dr. Nancy Bunting, Ph.D., ("Bunting"). See Transcript at 328-333. She administered WAIS testing, and his scores included a full scale IQ of sixty-eight. Although she discounted the accuracy of the score, she nevertheless diagnosed, inter alia, a "mathematics disorder." See Transcript at 331.[3] With respect to the effects of the disorder on his adaptive functioning, she opined the following:

> The patient's mother drove him to the appointment today. He had [a

---

[3]

A "mathematics disorder" is a type of learning disability in which a person's mathematical ability is substantially below average. The disorder can affect, inter alia, the person's ability to understand mathematical concepts, perform mathematical calculations, and understand word problems.

driver's] license in 2004 but said he only drove on familiar road locally by himself because he was "not good with directions." He now shops with his mother in the month he has been out of prison, and he said that previously in 2004 he shopped by himself with no problems, e.g., for his sports autograph collection. He has never used a checkbook. He said he paid his own bills on time in 2004 when he had his own apartment. He has always had difficulties making change. He can do household chores like washing dishes, doing laundry, sweeping or vacuuming, and cleaning. He claimed to only use a microwave, but it was not clear if that was because that was all that had been available. He spends his time fixing up the house where they are living, e.g., painting, doing yard work, watching television, listening to the radio and other music, using the Xbox to play NASCAR games, and reading the newspaper and sports books for one hour at a time. He used to have an autograph collection from various sports figures, but now he enjoys just going to the Wal-Mart with his mother.

The patient reported he has friends but is not involved in church or any other group. He has contact with his one neighbor.

The patient communicated and interacted in an immature, but adequate, manner.

The patient communicated in an intelligible and effective manner when he wanted to.

The patient has little capacity to cope with the typical mental/cognitive demands of basic work like tasks if the results of the WAIS testing are valid. He appeared to make no effort at all on either of the two trials for Immediate Recall, and he missed with no concern or distress. His digit span fell in the borderline range, and he counted backward from 20 adequately. He made no effort on serial 3s though the examiner had expected difficulty as he has a mathematics disorder. He has not had a job with co-workers and bosses, but he reports that he was able to handle getting along with other students and his teachers. He has some ability to deal with the public based on his behavior in the interview. He can follow instructions and he can handle work stress and changes.

The patient was reluctant to persist in the interview and testing situation. He has the capacity to persist at least for short periods of time as he can read or play a video game for one hour at a time by his report. …
The patient attended and sustained his concentration in the structured

testing and interview situation. His digit span fell in the borderline range and he could count backward from 20 adequately.

The patient has some ability to complete work-like tasks within an acceptable timeframe … since there is no evidence that he did his best on the tests requested.

See Transcript at 331-332. Bunting suspected that Labor was malingering and/or exaggerating and observed that his "symptom allegations were not congruent with his presentation." See Transcript at 332.

Labor sought medical treatment for his other impairments during 2013 and 2014. See Transcript at 345 (03/25/2013), 344 (06/14/2013), 343 (08/05/2013), 350-355 (04/04/2014), 356-360 (07/07/2014). The progress notes from those examinations offer no insight into his intellectual functioning, save to note that he has a history of a learning disorder.

Labor and his mother completed a series of documents in connection with Labor's application for supplemental security income payments. See Transcript at 183-192, 195-202, 207-214, 244-251. The documents reflect that Labor has difficulty understanding and following instructions and has trouble completing tasks. He can, though, attend to his own personal care; prepare simple meals; perform routine household chores such as cleaning, washing dishes, and vacuuming; perform some yard work; and read, watch television, and play games during his free time. He has never had a full-time job and never had any substantial gainful activity.

Labor testified during the administrative hearing. See Transcript at 29-45. He was

born on February 2, 1971, and was therefore forty-three years old at the time of the hearing. He graduated from high school, but all of his classes were special education classes. He has difficulty reading and writing and can perform "a little bit" of basic mathematics. See Transcript at 32. He has never worked a full-time job and attributed his inability to hold a job to being "too slow," specifically testifying that he does not "work real fast and stuff like that and try to keep up with people …" See Transcript at 32. Labor lives at a church shelter and helps out with odd jobs around the facility. He spends his free time watching television, reading sports magazines, and collecting sports memorabilia.[4]

The ALJ found at step two that Labor has severe impairments in the form of a personality disorder, a mathematics disorder, anxiety, and depression. The ALJ assessed Labor's residual functional capacity and found that he is capable of performing a full range of work at all exertional levels but with the following non-exertional limitations:

> … the work must not require excellent reading/writing skills. The claimant requires work that consists of simple, routine, and repetitive tasks. Interpersonal contact must be incidental to the work performed. The complexity of one or two step tasks is learned and performed by rote, with few variables, and requiring little judgment. The supervision required would be simple, direct, and concrete; the work must be limited to SVP one or two jobs that can be learned within 30 days.

See Transcript at 13. In so finding, the ALJ gave some weight to the evaluation performed

---

[4]

Labor's mother also testified during the administrative hearing. See Transcript at 45-58. Her testimony was consistent with his testimony.

in September of 1988, when Labor was seventeen years old, but gave no weight to the testing performed in March of 1993 and July of 1995.[5] The ALJ additionally gave "appropriate" weight to Bunting's opinions, noting her doubts about the reliability of Labor's IQ scores. See Transcript at 15.

Substantial evidence on the record as a whole supports the ALJ's characterization and consideration of Labor's intellectual disability at step two. The Court so finds for three reasons.

First, there is no doubt that Labor has an intellectual disability, and the ALJ so found. This case, then, does not involve an instance in which the ALJ overlooked or otherwise ignored a claimant's intellectual disability.

Second, the ALJ could and did properly rely upon Bunting's characterization of Labor's intellectual disability as a "mathematics disorder" and not borderline intellectual functioning. It is true that testing performed in March of 1993 and July of 1995, and testing performed by Bunting in April of 2013, placed Labor's intellectual functioning in the borderline and/or mildly mentally retarded range, but the ALJ could and did question the reliability of the testing. The testing from March of 1993 and July of 1995 occurred a number of years before the alleged onset date, and Bunting suspected that Labor was

---

[5]

The ALJ observed that "other IQ testing in the record [i.e., the testing performed in March of 1993 and July of 1995] does not provide the necessary support for finding of a significant subaverage intellectual functioning before the claimant's [twenty-second] birthday. Medical literature explains that an individual's intellectual capacity is generally fully formed by the time they are a teenager and that if there are no traumatic events or other intervening causes to demonstrate loss of cognitive abilities, one's IQ scores remain stable throughout their lives. Accordingly, the undersigned gives no weight to the IQ testing performed after the claimant's [twenty-second] birthday." See Transcript at 12.

malingering and/or exaggerating and discounted the accuracy of his IQ scores. Moreover, Labor's activities of daily living are inconsistent with his IQ scores. The record indicates that he can attend to his own personal care; prepare simple meals; perform routine household chores; perform some yard work; and read, watch television, and play games during his free time.

Third, the ALJ could and did properly find that Labor's "mathematics disorder" is a severe impairment. The record as a whole, and Bunting's opinions in particular, establishes that the disorder has more than a minimal effect on Labor's ability to work.

It is also worth observing that the assessment of Labor's residual functional capacity includes a limitation caused by an intellectual disability. Specifically, the ALJ found that Labor is capable of performing a full range of work at all exertional levels but has non-exertional limitations that prevent him from performing anything more than unskilled work. This case, then, is not an instance in which the ALJ failed to incorporate a severe intellectual impairment into the assessment of a claimant's residual functional capacity.

Labor maintains that the case at bar is identical to Nicola v. Astrue, 480 F.3d 885 (8th Cir. 2007), and a remand is warranted. In that case, there was some evidence to support a diagnosis of borderline intellectual functioning. Nicola maintained on appeal that the ALJ erred when he failed to identify the impairment as a severe impairment at step two. The Commissioner conceded that the ALJ should have included the impairment as a severe impairment at step two but maintained that the error was harmless. The

Court of Appeals disagreed and remanded the case as the Court was "persuaded by Nicola's assertion and the Commissioner's concession that the ALJ erred in failing to find that [the] diagnosis of borderline intellectual functioning was a severe impairment." See Id. at 887.

The case at bar is distinguishable from Nicola v. Astrue in at least three respects. First, there was some evidence to support a diagnosis of borderline intellectual functioning in Nicola v. Astrue; there is no such evidence in the case at bar. Second, the ALJ in Nicola v. Astrue failed to find that the claimant's intellectual disability was a severe impairment; in the case at bar, the ALJ found that Labor's "mathematics disorder" was a severe impairment. Third, the Commissioner in Nicola v. Astrue conceded that the ALJ should have included borderline intellectual functioning as a severe impairment; the ALJ in this instance makes no such concession.

Labor offers a second reason why the ALJ's findings are not supported by substantial evidence on the record. Labor maintains that the ALJ erred when he failed to complete a psychiatric review technique. Although the failure to prepare a psychiatric review technique can be reversible error, see Cuthrell v. Astrue, 702 F.3d 1114 (8th Cir. 2013), Nicola v. Astrue, supra, the record reflects that the two such analyses were completed in this case. As the Commissioner correctly notes, "[t]he first was performed by Cheryl Woodson-Johnson, Psy.D., on April 30, 2013, and the second was performed by Abesie Kelley, Ph.D., on September 23, 2013." See Document 12 at CM/ECF 6.

Given the foregoing, there is substantial evidence on the record as a whole to

support the ALJ's findings. Labor's complaint is therefore dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 11th day of January, 2017.


_____
UNITED STATES MAGISTRATE JUDGE